FT. WORTH & D. C. RY. CO. v. STALCUP.
(No. 599.)

(Court of Civil Appeals of Texas. Amarillo. April 11, 1914. On Motion for Rehearing, May 16, 1914.)

1. NEGLIGENCE (§ 121*) — PRESUMPTION AND BURDEN OF PROOF—RES IPSA LOQUITUR.

While the naked fact that an accident has happened may be no evidence of negligence, yet its character and the circumstances may be such as to lead reasonably to the belief that without negligence it would not have happened; and, when it is such as ordinarily does not happen, it affords reasonable evidence that it arose from negligence of the one controlling the particular thing causing the injury.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 217–220, 224–228, 271; Dec. Dig. § 121.*]

2. MASTER AND SERVANT (§ 278*)—ACTION FOR DEATH—SUFFICIENCY OF EVIDENCE.

Evidence, in an action for the death of a brakeman, held to show that his fall from a freight car was caused by defendant's negligence in suddenly stopping the train with unusual force and jar.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. § 278.*]

3. MASTER AND SERVANT (§ 137*)—OPERATION OF TRAIN—NEGLIGENCE.

The sudden stopping of a freight train with an unusual jar or jolt, in the absence of ordinary care, may be negligence entitling a servant injured thereby to recover.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 269, 270, 273, 274, 277, 278; Dec. Dig. § 137.*]

4. MASTER AND SERVANT (§ 289*)—ACTION FOR DEATH—INSTRUCTIONS—CONTRIBUTORY NEGLIGENCE.

Evidence, in an action for a brakeman's death by falling from a freight car under the wheels of another car while switching, held not sufficient to go to the jury on the issue of his contributory negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089, 1090, 1092–1132; Dec. Dig. § 289.*]

5. EVIDENCE (§ 59*) — FREIGHT BRAKEMAN — PRESUMPTION OF DUE CARE.

A freight brakeman is presumed by law to have acted with ordinary care in switching to protect himself from being thrown from the car by the usual and ordinary force incident to such work, and which he should have reasonably anticipated.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 79; Dec. Dig. § 59.*]

6. TRIAL (§ 194*)—INSTRUCTIONS—WEIGHT OF EVIDENCE.

In an action for a brakeman's death by falling from a freight car and being run over, the submission of the issue whether he was killed directly and proximately by defendant's negligence, together with a definition of negligence, and the expression "violently thrown," used in several of the issues, were not objectionable as a charge on the weight of evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 436, 439–441, 446–454, 456–466; Dec. Dig. § 194.*]

7. TRIAL (§ 296*)—INSTRUCTIONS—AMOUNT OF RECOVERY.

Where the court charged that if the jury found for plaintiff, they should not, in estimating damages, consider any mental anguish or grief that decedent's widow may have suffered, or any damages sustained by her by the loss of his society, an instruction that on finding certain issues for plaintiff they should state what amount would "fully compensate" the widow for her pecuniary loss was not objectionable as leading the jury to think that compensation should be large, and should cover the wife's grief for the loss of her husband's companionship.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 705–713, 715, 716, 718; Dec. Dig. § 296.*]

8. TRIAL (§ 133*)—MATTERS CONSIDERED—IMPROPER ARGUMENT STRICKEN OUT.

Where objectionable argument is withdrawn by counsel making it, and the jury is instructed to disregard it, the error is cured.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 316; Dec. Dig. § 133.*]

9. TRIAL (§ 118*)—ARGUMENT OF COUNSEL—DISCRETION OF TRIAL COURT — READING FROM REPORT.

Where defendant's counsel admitted that he had several authorities in point, and read some cases, the action of the trial court in permitting counsel for plaintiff to read part of a case in the hearing of the jury after the charge had been read, in the absence of any request that the jury be retired, or any instruction to disregard the reading of the case, was not an abuse of its discretion.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 290–293; Dec. Dig. § 118.*]

10. DEATH (§ 64*)—DAMAGES—EVIDENCE.

In an action for a brakeman's death, brought for the benefit of his widow, etc., testimony of his widow that at the time of his death they owned no property; that they were renting a house in which to live; that he was a good provider out of his wages—was admissible.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 83; Dec. Dig. § 64.*]

11. DEATH (§ 68*) — DAMAGES — EVIDENCE — HABITS OF DECEASED.

Testimony of the widow that her husband's habits were good; that he had no bad habits at all that she knew anything about—was admissible on the issue of damages, as well as the amount contributed by him to the support of the family and the probable duration of his life.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 86, 87; Dec. Dig. § 68.*]

12. DEATH (§ 67*)—DAMAGES—EVIDENCE—EXPECTANCY OF PROMOTION.

In such case testimony that deceased was a brakeman and extra conductor, and stood in line for promotion to be a conductor; that conductors received $45 or $50 per month more than a brakeman—was admissible as bearing upon his future expectations.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 88; Dec. Dig. § 67.*]

13. EVIDENCE (§ 471*)—OPINION EVIDENCE—FACT OR CONCLUSION—STOP OF TRAIN.

Testimony of an adult witness, who had been in a railroad's employ for about 10 months at the place of the accident, that the train "was moving pretty fast," and that it stopped "unusually hard," considered with his further testimony that a brakeman fell from one of the cars when the train stopped and was killed, was admissible as a statement of fact.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2149–2185; Dec. Dig. § 471.*]

14. APPEAL AND ERROR (§ 750*)—ASSIGNMENT—CHARGE.

An assignment of error to the refusal to charge that there was no presumption that a brakeman was killed as the result of the rail-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

road's negligence did not present the issue as to whether, from the mere happening of the accident, the jury were likely to find negligence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3074–3083; Dec. Dig. § 750.*]

15. TRIAL (§ 194*) — INSTRUCTIONS — NEGLIGENCE—QUESTIONS OF FACT.
Such charge would have been improper as invading the province of the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 436, 439–441, 446–454, 456–466; Dec. Dig. § 194.*]

16. MASTER AND SERVANT (§ 256*)—PLEADING —DESIGNATION OF ACT UNDER WHICH ACTION BROUGHT.
A petition in an action by an administrator, alleging that the road on which intestate was killed ran from Ft. Worth, Tex., to Denver, Colo.; that he was killed in making up a train in Texas to be moved to Colorado; that the railroad ran through trains from Ft. Worth, Tex., to Denver, Colo.—was a sufficient designation that it was not brought under the state statutes, but under the federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]).

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 809–812, 815; Dec. Dig. § 256.*]

17. DEATH (§ 99*)—EXCESSIVE DAMAGES.
A verdict of $7,500 for the death of a brakeman, 43 years old, experienced, sober, industrious, and in line for promotion, and earning from $125 to $140 per month, was not excessive.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. § 99.*]

### On Motion for Rehearing.

18. APPEAL AND ERROR (§ 1050*)—HARMLESS ERROR—ADMISSION OF EVIDENCE.
In an action for a brakeman's death, where evidence that he and his wife had been wholly dependent on his salary was admitted without objection, error, if any, in the admission of evidence that they did not own any property when he was killed was harmless, since the former statement substantially included the latter.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050.*]

Appeal from District Court, Dallam County; D. B. Hill, Judge.

Action by R. E. Stalcup, administrator, against the Ft. Worth & Denver City Railway Company and another. Dismissed as to the other defendant before judgment, judgment for plaintiff, and defendant Ft. Worth & Denver City Railway Company appeals. Affirmed.

Thompson & Barwise, of Ft. Worth, Clifford Braly, of Dalhart, and W. B. Chauncey, of Wichita Falls, for appellant. R. E. Stalcup, of Dalhart, Del W. Harrington, of Amarillo, Goree & Turner and Cowan & Burney, all of Ft. Worth, for appellee.

HUFF, C. J. The appellee, R. E. Stalcup, as administrator of the estate of J. E. Brown, deceased, brought suit for recovery of damages occasioned by the death of J. E. Brown, who in March, 1911, lost his life while engaged in the service of the appellant, as brakeman in the switchyards at Texline, Tex.

The trial resulted in a verdict for the appellee in the sum of $7,500.

It is alleged in the petition that J. E. Brown, deceased, was violently thrown from the cars of appellant by reason of the negligence of appellant in the following particulars, to wit:

"(a) That the braking equipment on the car on which the said Brown was riding was defective, in this: That the ratchet pawl on said braking equipment, and the bolt holding the same, was so broken and in bad order and missing as to render the said braking equipment useless and dangerous to one attempting to use the same. (b) That the train and car on which said Brown was riding at said time was being moved and operated at an unusual and unnecessary high rate of speed for the purpose for which they were being moved and operated, and while being so moved and operated was suddenly stopped with the unusual and unnecessary force and jar and shock that the proximate results of the negligence of the said defendant, as alleged in the preceding paragraph, the said J. E. Brown was violently thrown to the ground on the tracks of the defendant and run over and killed as aforesaid."

The ground (a) set out in the pleadings was not submitted to the jury as an issue by the trial court, but only the ground set out under (b). The facts in this case show that Brown was a brakeman in the employ of appellant company, and that the train crew with which he was working at the time the accident occurred was composed of Gaynor, conductor, O'Nell, brakeman, Thompson, engineer, and Shaw, fireman; that they were doing the work of switching incident to making up a train which they were to carry out that night at 9 o'clock to Trinidad, Colo. This train was partially made up, and was standing on what is designated in the record as the passing track. Just prior to the accident Brown and his crew took the engine and went down to a side track just west of the main line, known in the record as track No. 1, to get a cut of 32 cars, the rear 6 of which, and probably others, were going into the train they were making up. The accident happened while the crew were handling this string of 32 cars, and the evidence in this case relates to what was done from the time the crew picked up this string of cars 3,000 feet south of where the accident occurred. The evidence shows that this string of cars was pulled north until the last, the thirty-second car, had passed the switch, about two or three car lengths by which the passing track was reached, designated as "A" on the map in the record, and located about 20 feet south of the most southern water tank shown on the map. While this string of cars was being moved north from the starting point, Gaynor and O'Nell and Brown rode on the rear or thirty-second car until they reached the switch stand, marked "C" on the map, which was the switch to track No. 1, and there Gaynor got off to throw that switch so that certain of the cars could be kicked back on that track. O'Nell rode on up until

he got to switch A, where he got off to throw that switch so that the rear of these cars could be kicked in onto the passing track. Brown remained on top of the thirty-second car for the purpose of riding this cut of 6 cars down onto the passing track, where they were to be coupled onto the partially made up train. The accident occurred after the rear or thirty-second car had cleared switch A, and Brown's body after the accident was found lying under the front trucks of the thirty-first car on the east side of the track, and opposite and a little north of the north water tank. Each of appellant's witnesses testified that they did not notice anything unusual or out of the ordinary in any movement of the train from the time they picked up this string of 32 .cars until the accident occurred, either as to speed or as to any stop that was made; that the switching in every particular was done in the usual and customary manner; that there was always more or less jarring of the cars in switching, caused by the running up of the slack; and that there was from 8 to 12 inches of slack between all freight cars. All the train crew knew the work that was to be done and the cars that were to be handled and switched in on the passing track.

Gaynor, the conductor, testified that when the accident occurred he was somewhere between switch A and B; that he was unable to determine his exact location, but that he was about 5 or 6 car lengths from the rear end of the string of 32 cars; that he walked over there from switch C, where he got off, and that it was about 1½ minutes after he got off at switch C until the accident occurred. "As to whether I saw or heard Brown fall from the car, I just heard his lantern break, and when the wheels ran over him I heard him moan. As soon as I heard the lantern break, I gave the engineer a violent stop signal, and at the time I gave this signal the cars were moving south and the train was stopped in response to the signal. O'Nell also gave the signal, and called to me that Brown fell or was killed. As soon as I heard Brown's lantern fall, I went to where he was lying. He was lying across the rail and between the trucks of the forward pair of wheels on the thirty-first car, that is, between the two wheels on the north end of that car. There are two wheels that constitute the trucks of the car, and there are a set of trucks near each end of the car. He was lying on the right-hand side of the truck looking towards Denver, on what would be the east side. I examined the indications there to determine whether or not any other wheels had run over him, and I found from the signs that the south two wheels on the east side of this thirty-first car ran over his body, and his body had been dragged, I should judge, 25 or 26 feet, and his body was lying just north of the north water tank, or very close. It

would not be over 8 or 10 feet. I did say the train was moving south, and that his body was dragged 25 feet in a southerly direction." He testified that Brown was nearly dead when he got to him, and tried to talk, but could not. The wheels ran over him just about the abdomen. "The last time I saw Brown after I got off the car he was on the rear car about the center, and was standing up." He stated further:

"When I went back from the depot to the place where the accident occurred, I investigated to find out as to how Brown came to fall, and after this examination I never did make up my mind or find out how Brown happened to this accident."

He further testified as to the condition of the pawl on the brake:

"From my association with him, Brown, as a trainman, conductor, or brakeman, I would say, as to his capabilities as to a brakeman or conductor, there could not have been any better."

O'Nell testified:

That the "train of 32 cars moved a couple of car lengths north after I dropped off at the switch [referring to switch A]. I do not know whether the last car of these 32 went north of the north tank or not. I do not know just how far they did go beyond the tank. After the south end of that string of cars passed over that switch [referring to switch A] and cleared it so we could get back on the passing track, I gave the engineer a stop signal, and the train was stopped in response to this signal; then I next gave the engineer a back-up signal, and in response to this back-up signal the engineer started back. I think the entire train had passed the switch track; the last car in the train had passed the switch at the time I gave the stop signal. It ordinarily takes from 10 to 15 seconds to throw a switch. Immediately after I threw the switch, I gave the back-up signal. Some 18 or 20 seconds elapsed between the time I gave the stop signal and the back-up signal. The two signals would be very close together. In reference to the estimates I have given as to the time between the throwing of the switch and giving the back-up signal, and the time to throw.the switch, I have never experimented to see what the actual time would be. After I had thrown the switch for the passing track, and had given the engineer the back-up signal, I then started up north to make the cut; that is, to cut off the cars that would be kicked into our train on the passing track. I started up the east side of the train; I was running. My purpose in running up along the train was to get up to the place to cut off these cars before they got to going too fast, and so that the other cars would not get over the switch. The first I knew about the happening of this accident was when I was running up along the train I heard the lantern fall and Brown groan. I think I was then about a car and a half up north from where Brown fell. I immediately gave a stop signal. When the train stopped after the accident I was north of where Brown's body was. The cars were moving south at the time I gave this sudden stop signal.' They moved about 30 feet, I should think, after I gave the signal. The train was standing still when I got to where Brown was lying. It could not have been very long after I gave the back-up signal until I heard the lantern fall, not over a minute. I cannot remember whether it was instantaneously. I was running up there, and it is pretty hard to remember that. When I gave the stop signal after hearing the lantern fall the train was stopped in response to it. I then went back to where Brown was. I think his body was pretty near opposite the north water tank. It was close to the water

tank. I think the body was dragged a little ways from the indications, and appeared to be dragged about 10 or 20 feet in a southerly direction. The last time I saw Brown he was on top of the last car; that is the thirty-second car from the engine. I do not remember whether he was standing or sitting. As I went by the car he said, 'Charlie, you open that knuckle.' He referred to the knuckle on the rear car. It was necessary to have this knuckle open so that these cars would couple onto our train when they rolled down. The first I knew about the happening of this accident when I was running up along the train I heard a lantern fall and Brown groan." He said that "after the cars stopped, and while they were moving back after I gave the stop signal after having heard the lantern fall, the cars were moving slow, just about like a man would walk."

The engineer, Mr. Thompson, testified:

"When I got the stop signal on this occasion to stop I stopped the train. After getting the stop signal I think probably the engine and cars moved on north two or three car lengths; this I make as a rough estimate. After we pulled up past the switch for the passing track and stopped, I got then a back-up signal, and when I got this signal I started the cars back. As to the length of time that lapsed between these two signals, that is, the stop signal to stop and the back-up signal, it would be only guess work; they were very close together, just in the ordinary time. After you get the back-up signal, and before you get the engine moving back, it would require but 5 or 10 or 15 seconds. As to how long it was after I started back on this occasion to kick these cars in on the passing track until I got the stop signal I could not recall exactly. Just a very few seconds I know—just got the train started. After having started back at this place I recollect having got a stop signal, and when I got this I stopped the engine and found out afterwards that Brown had been killed. I got back-up signal and started backing, and between that time and the time I got the stop signal and stopped I was moving the train just about as slow as she would move. It was very slow, and we were just starting back. The engine and train at the time the accident happened and while I could not be exact, it had moved only a very few feet. I would say as a rough guess about 10 feet when I got the stop signal. When I was notified that Brown was killed I went back to where he was and saw his body. He was dead when I got there. I helped remove the body. The south car of this string of cars was a little south of the north tank. The entire car was south of the tank. Brown's body was nearly opposite the north water tank as near as I can recollect, and was under the forward end of the next to the last car. The amount of slack that there would be in a cut of 32 cars I should judge would be in the neighborhood of 25 feet. It is not ordinary and usual in the work of doing switching with a string of cars to throw a man off of the top of the car. It is true that on rare occasions, and once in a while even though a train is handled in the usual way, a brakeman will stumble and miss his guess as to the distance and fall, or step off of the top of a car when there is nothing wrong in the handling of a train. This happens in rare instances to a brakeman, even though there is nothing wrong in the way in which a train is handled."

Shaw, the fireman, testified:

"As to the manner in which this train was handled from the time we coupled on the string of 32 cars in the south yard and while coming up north to the place near the water tank with these cars, there was nothing unusual in the movement of this train. We just went up there about the way we always do, six or seven miles an hour. At the time the stop was made

we were moving south, when we heard of his being killed. It was just a short time after we made the stop. The engine had not moved south far after the stop was made to back up, and when we got the stop signal to stop it, had moved just a short distance and not more than taken the slack out of the cars—it did not seem like to me. I did not know how long the engine stood still after we pulled it north and stopped at the switch for the passing track until it started south. The engine stood still until we got a signal to back up. I do not know how long it stood still; it was a very short time, but long enough for the brakeman to throw the switch. I cannot estimate in seconds how long that was. No, we do not kill a brakeman every time we go to switch a train of cars."

The rate of speed given by the witnesses with the 32 cars going north is estimated not to exceed six or seven miles, and that it slowed down just before the train was stopped. The witnesses say they estimate the car length at 40 feet. The appellee introduced Arch. V. Bryan, whose testimony we will notice later.

This suit was originally brought against the Colorado Southern Railway Company and the Ft. Worth & Denver. The Colorado Southern was dismissed out of the case before the judgment was taken.

The appellant, by first, second, and third assignments of error urges that the trial court was in error in submitting the question of negligence to the jury, and that the evidence was insufficient to support the findings of the jury on the question of negligence.

Was the death of Brown occasioned by the sudden stopping of the car with unusual and unnecessary force and jar? If so, was appellant negligent in so doing?

[1] "While the naked fact that an accident has happened may be no evidence of negligence, yet the character of the accident and the circumstances in proof attending it may be such as to lead reasonably to the belief that without negligence it would not have occurred. Ry. Co. v. Suggs, 62 Tex. 323. When the particular thing causing the injury has been shown to be under the management of the defendant or his servant, and the accident is such as in the ordinary course of things does not happen, if those who have the management use proper care, it affords reasonable evidence in the absence of explanation that the accident arose from a want of care." Washington v. Railway Co., 90 Tex. 314, 38 S. W. 764; McCray v. Ry. Co., 89 Tex. 168, 34 S. W. 95.

[2] The deceased was on car 32, the last from the engine near the center of the car, when last seen alive. After the accident his body was found under car 31, or next to the last and between the wheels of the truck at the northeast corner of that car. The evidence shows with reasonable certainty that the wheels of the truck at the southeast corner of that car ran over the body, and that the body was dragged some 25 or 26 feet south. There is no evidence showing that car 32 on which the deceased was riding, or any

portion of it, ran over him. The facts so shown authorize the inference that Brown fell in the direction the train was going before it was stopped, and between the two cars, 31 and 32, and that the wheels of the trucks on the east side of car 31 ran over and killed him. The evidence shows that the body was found 8 or 10 feet north of the north water tank. The train was stopped at that point in its backward movement south in obedience to stop signals given by Conductor Gaynor and Brakeman O'Nell. They gave these signals when they heard Brown's lantern fall and break. The evidence is that switch A, the one O'Nell operated, is 20 feet south of the center of the south water tank. To the north of the two water tanks there is another switch stand designated "E" on the map in evidence, and is north of switch stand A 53.5 feet. The two water tanks are shown to be between these two switch stands on the map and by the evidence. O'Nell testifies that after he dropped off at switch A his train moved north, estimated by him two car lengths, and he did not know whether car 32 went north of the north tank or not. After the south end of the train passed over switch A and cleared it, he gave the engineer the stop signal, and immediately after throwing the switch he gave the back-up signal. He thought some 10 or 15 seconds lapsed between the stop and back-up signals. The engineer, Thompson, thought after getting the first stop signal the engine and cars moved north two or three car lengths, which he gave as a rough estimate. After he got the back-up signal the train, he thought, had moved, about 10 feet as a rough guess, before he got the stop signal for the accident. From this evidence it is reasonably certain that when Brown fell he was at least 40 feet north of the north tank. From the facts and measurements, we think that it is a reasonable inference that the north end of car 32, on which Brown was stationed, was stopped at or near the point where he fell. The stop of the cars and Brown's fall concurred, and it is a reasonable inference from the physical facts and other testimony that they were coincident in time and place. The facts show he fell in the direction the car was going just previous to the stop, and before the movement of the train was reversed. He fell beneath the car just in front of the one upon which he was stationed. The inference is a reasonable one that the stop threw him forward, down and under car 31. The inference is almost irresistible from the known and proven facts that such was the nature of his fall.

The question is: Was there a sudden stop with unusual and unnecessary force or jar, which caused the fall? The evidence is that a fall by a brakeman from a train handled in the usual and ordinary way is an unusual occurrence, and such accidents under such circumstances are not usual. The evidence further shows that Brown was an experienced brakeman and conductor and one of the best. It follows, therefore, that the train was then handled out of the usual or ordinary way, or that Brown, the brakeman, fell in an unusual way while the train was being handled as usual or in the ordinary way. That the impact of the cars with the stop threw Brown forward and under the car is certainly fairly inferable. If it was an ordinary stop, from the testimony it is not probable that he would have been so thrown. It was an unusual, sudden stop, and an unnecessary force and jar that caused the fall, is inferable from the facts proven. The evidence leaves no doubt that the occasion did not require such a stop and such unnecessary force or jar. The negligence is not inferred from the force and jar alone, but from the facts in evidence which establish that there was no occasion for such a stop or force; hence negligence is presumed from such other facts. The fall and jar we estimate by inference, from certain proven facts, and negligence is established by the facts which show no occasion for the use of an extraordinary stop, force, or jar. The engineer, conductor, and brakeman all testified that the train was handled in the usual and ordinary way without any unnecessary force or jar. The jury evidently did not accept their statement. The brakeman O'Nell, says after giving the back-up signal he started north in a run to reach a point in the train where a cut of five or six cars was to be made, and as he passed Brown, Brown asked him to open up the knuckle on the back of car 32, which was to be coupled on to the rest of the train to be taken out and which was then standing on the passing track, then consisting of about twenty cars. At the time he passed Brown the train was reversed south, and that shortly thereafter he heard the lantern fall. The conductor says the train was moving south when he heard the lantern fall. It will be noted that all the testimony is that the train had gone north of switch A about two car lengths when the train was stopped. The witnesses say they estimate a car length at 40 feet. So the train had gone 80 feet north of O'Nell when he gave the back-up signal, which was as soon as he could operate the switch. The engineer says as soon as he got the back-up signal he reversed his engine and started south and had gone south 10 feet when he got the stop signal for the accident. While he was reversing his engine and going 10 feet O'Nell had to complete his work and run 80 feet past Brown's car, and he says he was, when the lantern fell, one or two cars north. From the movements required and the time taken by the engineer it is not at all probable that the facts occurred in the order named by O'Nell and the conductor, and the jury could, we think, reasonably infer that O'Nell and the conductor were in error in stating that the train was

moving south when the lantern fell. Again, O'Nell says Brown told him as he passed to open the knuckle on the south end of the car 32. O'Nell was going north, and had then passed the south end of the car, which as it descended the grade would gather in momentum. It is altogether improbable that he and Brown intended O'Nell to open the knuckle after O'Nell had cut the train five cars north of car 32, and then catch the cut as it ran south and open the knuckle on its south end. The jury evidently did not accept this statement as occurring at the time O'Nell says it did. If Brown's request was made, it is probable it occurred at switch A, O'Nell's station, when it was reached by car 32, on the north trip, and not on the return south.

[3] Appellee introduced Arch. V. Bryan, who was 33 years of age, and at the time of the accident was in the employ of appellant, and on the pay roll as call boy, but assisted as flue puncher and hostler helper, and at the time of the accident had been employed by appellant at Texline, the place of the accident, 10 months. On the night of the accident he was assisting with an engine, and was standing at the switch to let it out on the main line. The train in question pulled by him on the main line. His testimony is:

"Their train was pulling north on the main track, working steam pretty heavy. They were pulling a string of some 25 or 30 cars, and just before the last car passed the switch to the rip track one of the brakemen on the train gave the stop signal, and the train stopped very suddenly, unusually hard, and I saw the lantern of the man that was killed fall from the train. I was standing some 40 or 50 feet, and heard the lantern break when it fell."

We think this testimony not only corroborates the facts and inferences deducible that there was a sudden stop, and unusually hard, and is entirely consistent with the allegation that the sudden stop and unnecessary force and jar threw Brown from the top of car 32 and under car 31, and that the fall was caused by the negligent acts of appellant in charge of the train. This witness clearly makes the stop of the train and the fall concurrent acts. We think the facts by appellant's witnesses strongly indicate that such acts were concurrent, and, further, to have occasioned such a fall, the force and jar were unusual and unnecessary. That an experienced railroad man would not have so fallen had the stop, force, and jar been in the usual or ordinary way. The facts further indicate at that time there was no occasion for such a stop, and if ordinary care had been used, no such stop would have been made. We think the cases cited by appellant turn on the question that there was nothing to take the jerk or jar out of the usual or ordinary occurrence incident to handling the train. This case is taken out of that class by the circumstances surrounding the accident and indicating the manner in which it occurred, and that it was not probable that it would have so occurred unless it had been unusual and unnecessarily

stopped suddenly and with force unusually hard. The witness Bryan says it stopped very suddenly and unusually hard. This testimony certainly takes it out of the usual and ordinary stop. It is suggested by appellant that his evidence is valueless because there is nothing in the testimony to show with what the witness compared it, as, for instance, that a stop by a freight train without air brakes would be hard as compared with a stop of one with air brakes. The record shows that in switching in the yard air brakes are not used, and that the usual and ordinary way was without air brakes, the method used in this case. Bryan had been in the switchyards at Texline for 10 months in appellant's employ. The question is not here made that he did not know what was a sudden stop or an unusually hard one in that instance. His 10 months' experience was sufficient to enable him to know, and the jury had all these facts by which they could weigh his testimony. If this sudden and unusually hard stop caused the death, we think there can be no question but negligence was shown. The entire train crew, including the engineer, knew the work that was to be done; that the brakeman must be upon the cut of cars; if, as the jury found, it was a sudden and unusually hard stop, then it was out of the usual and ordinary stop incident to handling such trains, and the unusual stop was made without warning. The evidence shows no warning, and none is claimed, but, on the contrary, appellant seeks to justify or avoid liability on the ground that it was the usual and ordinary stop. If the stop was made as the jury found, it was negligently made. Ry. Co. v. Johnson, 159 S. W. 406; Ry. Co. v. Stone, 125 S. W. 587; Ry. Co. v. White, 51 S. W. 855; Ry. Co. v. Choate, 22 Tex. Civ. App. 618, 56 S. W. 215; Ry. Co. v. Harrison, 104 S. W. 399; Ry. Co. v. Boone, 105 Tex. 188, 146 S. W. 537. The sudden stopping of a train and an unusual jar or jolt may become negligence upon which an employé could recover, and is applicable to the relation of master and servant, as well as carrier and passenger. The same degree of care may not be required, but when the act lacks ordinary care, the servant is entitled to recover. Ry. Co. v. Pope, 98 Tex. 535, 86 S. W. 5; Ry. Co. v. Mitchell, 48 Tex. Civ. App. 381, 107 S. W. 374.

[4, 5] The fourth assignment of error lodges complaint at the action of the trial court in refusing to charge upon contributory negligence. After an examination of the record with reference to the question, we have concluded the evidence does not raise the issue. The deceased was where he was required to be at the time, that is, on the cut of cars to be switched, and which he was riding in onto the passing track and coupled to the cars which were to constitute the train to be carried out. There is no proof of any act or thing done by Brown upon which negligence on his part could be predicated. Ry. Co. v.

Bell, 93 Tex. 632, 57 S. W. 939; Ry. Co. v. Boone, 105 Tex. 188, 146 S. W. 533. He is presumed by law to have acted with ordinary care while engaged in the work of switching to protect himself from being thrown from the car from the usual and ordinary force incident to such work, and which he should have reasonably anticipated. In the absence of testimony rebutting this presumption, we think it was proper to refuse the charge. Dunlap v. Chemical Works, 159 Mo. App. 49, 139 S. W. 829; McMenany v. Steel Co., 130 S. W. 357.

The fifth, sixth, and seventh assignments relate to the charge of the court and the issues submitted as follows:

"From the evidence before you in this case, you will answer the following special issues, as you find the facts to be, and answer said issues in the order in which they are submitted.

"Special issue No. 1: Was the deceased J. E. Brown, on the night of March 8, 1911, violently thrown from a train or car of the Ft. Worth & Denver City Railway Company, in the town of Texline, Texas? If you answer the foregoing issue No. 1 in the negative, you will proceed no further, but report your finding to the court. But if you answer said issue in the affirmative, then you will proceed to answer the following special issues:

"Special issue No. 2: Was the said J. E. Brown run over and killed as a direct and proximate result of being violently thrown from said train or car?

"Special issue No. 3: Was the said J. E. Brown violently thrown from said train or car as a direct and proximate result of any unusual or unnecessary shock or jar of said train or car?

"Special issue No. 4: If you answer the foregoing special issues Nos. 2 and 3 in the affirmative, you will then state whether or not the unusual and unnecessary shock or jar of said train or car, and the running over and killing of said J. E. Brown, was directly and proximately caused by the negligence of the defendant, Ft. W. & D. C. Ry. Co., its agents or employés in charge of said train.

"In answering the special issue No. 4, you are instructed by the term 'negligence' is meant a failure to exercise such care as a person of ordinary prudence would exercise under the same and similar circumstances.

"In this connection, you are further instructed that by the term 'direct and proximate cause' is meant the immediate cause, or that without which the accident would not have happened.

"Special issue No. 4a: Did deceased J. E. Brown, assume the risk to and arising from the shock or jar, if any, of the train or car upon which he was riding at the time he was killed?

"In answering the foregoing special issue No. 4 you will observe the following, to wit: You are instructed that an employé assumes such risks as are ordinarily incident to the service he undertakes, and such others as he knows of, or by ordinary care in the discharge of his duties would have known of. But the negligence of the employer is not one of the assumed risks, unless the employé knows of such increased risk, or by ordinary care would have known of it. If the jury believes that the deceased, J. E. Brown, was violently thrown from the train or car on which he was riding, by reason of a jar or shock of said train or car, and that such jar or shock was not such as is ordinarily incident to the service in which said J. E. Brown was engaged at said time, and was not one of which he knew, or by the exercise of ordinary care in the discharge of his duties would have known, then you will answer the foregoing special issue No. 4a, No; and, un-less you so believe, your answer to said issue will be Yes.

"Special issue No. 5: Did Mrs. Julia Brown, wife of the said J. E. Brown, suffer any pecuniary loss or injury as a result of the death of said J. E. Brown?

"Special issue No. 6: If you answer the preceding interrogatory No. 5 in the affirmative, then state from all the evidence what amount, if paid now, will fully compensate her for the pecuniary loss or injury sustained by her by reason of the death of said J. E. Brown."

[6] The proposition presented under the fifth assignment is to the effect that the court assumed that appellant was guilty of negligence, and was a charge on the weight of the evidence in asking the jury whether or not the unusual and unnecessary shock or jar of the train was caused "by the negligence of the defendant"; that the language was subject to the construction by the jury that it was the view of the trial court that the defendant was guilty of negligence. We overrule the fifth assignment and propositions thereunder. The court submitted the issue to the jury; if they answered the preceding issues in the affirmative, "you will then state whether or not" Brown was killed, "directly and proximately by the negligence," etc. "In answering special issue No. 4, you are instructed by the term 'negligence' is meant a failure," etc., defining negligence. We think, when the issue and the charge are read together, the jury would certainly understand that the defendant company and its employés, before it would be liable, must have failed to exercise such care as a person of ordinary prudence would have done under similar circumstances.

The proposition under the sixth assignment is to the effect that the court, by the expression "violently thrown" used in issues 1, 2, and 3, amounted to a suggestion from the court that Brown was thrown from the cars as a result of negligence. We do not know whether we get the force of appellant's complaint or criticism, but we do not see a suggestion that such language means that Brown was thrown from the car by the negligence of the appellant. It occurs to us that the court required the jury to find more than was necessary before they could find anything for appellee. Under the issue all the jury had to find, as we understand, was that the train was stopped very suddenly and unusually hard, and that thereby Brown was caused to fall; but, under these issues, they were required to find that he was "violently thrown" from the car, before they were authorized to find for appellee.

[7] The proposition under the seventh assignment is to the effect that under the sixth special issue the court required the jury to find what sum, if paid now, will "fully compensate her" for the pecuniary loss due to the death of Brown. That this was likely to be construed by the jury as meaning that compensation should be large, and should "cover the mental anguish and grief of his

wife for the loss of his society and the companionship of her husband."

In the case of Ry. Co. v. McVey, 83 S. W. 34, a charge using the term "fully compensate" was approved as being a proper charge. The court in this case gave, at the request of appellee, charge No. 1 as follows:

"You are hereby instructed by the court that if you find in favor of plaintiff on any issue of liability, you must not, in estimating the damages, take into consideration any mental anguish or grief that Mrs. Brown may have suffered on account of the death of her husband and must not take into consideration in estimating the damages any damage she may have sustained on account of the loss of the society or companionship of her husband."

The charge originally given by the court confined the damage to pecuniary loss. We do not think any injury is shown by this charge of the court.

[8] The eighth and ninth assignments are based upon certain language used by appellee's attorney in the opening argument. This language was improper and out of the record. The trial court so instructed the jury, and the counsel making the same admitted at the time that it was improper and withdrew it. Appellant, nevertheless presents its bills of exception, and insists thereon. It appears to be the practice when objectionable argument is made and withdrawn by counsel making it, and the jury is instructed by the court to disregard it, that the error is held as cured. Ry. Co. v. Crosson, 39 Tex. Civ. App. 369, 87 S. W. 867; Ry. Co. v. Johnson, 125 S. W. 390. However, if it was manifest from the record that such argument was instrumental in obtaining an improper verdict, even after withdrawal, or if we were reasonably sure such was the effect of the argument, we would not hesitate to set aside a verdict so obtained. Counsel should not violate the rule to the advantage of his client, and then seek to withdraw what he must know he had no right to utter.

[9] The tenth assignment is based upon the action of the court in permitting counsel for appellee to read a portion of the case of Ry. Co. v. Abernathy, 58 S. W. 175, to the court, in the presence and hearing of the jury. The extract read is set out in the bill of exceptions, and appears to be a discussion of the law as applicable to the facts in that case. The charge of the court at the time the decision was read had been prepared and read to the jury. Appellant objected that the necessary effect of reading the case, if it was not the purpose, was to get the idea in the minds of the jury that the jury upon the mere happening of the accident could find negligence upon the part of defendant. The court explains the bill by stating that when the objection was made counsel for appellee said appellant had a whole stock of books which he was going to read, to which appellant's counsel admitted that he had two or three authorities in point, but that he nevertheless objected to counsel for appellee reading law to the court because the issues of law had been settled. The court replied that if he permitted one he would grant both the privilege, and thereafter counsel for appellant did read some fact cases. It is not shown by the record that there was any request that the jury be retired, and no instructions were given to the jury to disregard the reading of the case. We find nothing in the record showing that the court abused his discretion. Ry. v. Wesch, 21 S. W. 63; Ry. Co. v. Ross, 55 Tex. Civ. App. 622, 119 S. W. 725. The necessity for reading authorities to the court after the charge was read to the jury is not apparent, and why either counsel should desire to do so we are not informed. We may say, however, that in addition to the specially requested charge by appellant asking an instructed verdict on the ground that no negligence was shown as to appellant, appellant also by a motion in writing requested the court to so instruct the jury. Whether the court had at that time acted on the motion, or then had it under consideration, we are not informed, but evidently for some purpose he was desirous of hearing further authority, and he permitted both sides to present to him additional authority. The court evidently was not satisfied as to his course and his duty with reference to the instructions requested. The record in this case shows appellant strenuously contended in the trial court, as well as in this court, that there was no evidence showing negligence on its part or that of its employés. Under the facts of this case we are unable to say the trial court abused its discretion.

[10] The eleventh assignment is based on the admission of the testimony of Mrs. Brown, over the objection of appellant. She testified in effect at the time of the death of her husband, J. E. Brown, they owned no property. In addition to the testimony objected to, she testified that they were renting a home in which to live; that he was a good provider out of the wages received for his services. The rule now appears to be in this state that such testimony is admissible. Ry. Co. v. Gormley, 35 S. W. 488; Ry. Co. v. Lehmberg, 75 Tex. 68, 12 S. W. 838.

[11] The twelfth assignment is presented on the testimony of Mrs. Brown that "Mr. Brown's moral habits were good, and he had no bad habits at all that I know anything about." The objection was that it was immaterial, irrelevant, and prejudicial. The health, habits, sobriety, and the like appear to be proper matters of inquiry when death is the basis of a suit for damages. Ry. Co. v. Cowser, 57 Tex. 297, 304; Ry. Co. v. Douglas, 73 Tex. 325, 11 S. W. 333, second column 334; Beaumont Traction Co. v. Dilworth, 94 S. W. 352, 356, bottom second column. This testimony is proper for consideration in estimating the damages and amount contributed to the support of the family and probable dura-

tion of the life of the deceased as we understand the authorities.

[12] The thirteenth assignment is based on the admission of the testimony of Gaynor, the conductor, upon cross-examination by appellee, which is:

"Mr. Brown was the brakeman, might say both; he was an extra conductor. As a matter of fact, Mr. Brown as a brakeman stood in line of promotion to be a conductor. He was already a conductor"

—further following this testimony by stating that conductors received $45 or $50 per month more pay than a brakeman. Appellant objected on the ground that the question of promotion, or chance of promotion of an employé who is killed or injured, when offered as a basis of damages, is speculative, contingent, and remote, and should not be taken into consideration for measuring damages. This character of testimony has been admitted and allowed in this state in reference to the deceased employé's future expectations. Ry. Co. v. Ford, 46 S. W. 77, 79; Ry. Co. v. John, 9 Tex. Civ. App. 342, 29 S. W. 558; Ry. Co. v. Johnson, 78 Tex. 536, 15 S. W. 104.

The fourteenth assignment complains at the action of the trial court in permitting appellee to question P. J. Gaynor upon cross-examination with reference to certain reports made by him upon the accident at the time and a day or so afterwards, and in the action of appellee's attorney in requesting or asking counsel for appellant for the reports. Without setting out fully the statement contained in the bill we think it sufficient to say that we find no injury by these questions and request.

[13] The fifteenth assignment is based upon the bills of exceptions to Bryan's testimony that the train "was moving pretty fast," and that it stopped "unusually hard" because it was a conclusion and opinion of the witness, and not a statement of a fact; that the statement was merely relative, and did not give with it any attending fact. This character of evidence has been frequently held admissible. McCabe v. San Antonio Traction Co., 39 Tex. Civ. App. 614, 88 S. W. 387; Ry. Co. v. Bitting, 140 S. W. 382, 383; Ry. Co. v. Girard, 65 Tex. 560; Ry. Co. v. Bishop, 154 S. W. 305, 311. We think that the attending fact, testified to by the witness, that a man and a brakeman was on top of one of the cars with a lantern, and when the train stopped the lantern fell and broke, and the brakeman fell under the forward car and was run over by it and killed, are attending facts which amply support the statement made by the witness.

[14, 15] The sixteenth assignment is based on the refusal of the court to give specially requested charge to the effect that there is no presumption that the deceased was killed as a result of negligence on the part of appellant. The particular question appears to be that from the mere happening of the accident the jury were likely to find negligence.

The charge requested does not present the issue as assigned. If it did, however, we think it would be improper to so instruct the jury. Stooksbury v. Swan, 85 Tex. 563, 22 S. W. 963; Ry. Co. v. Baker, 58 S. W. 964, 996.

[16] The seventeenth and eighteenth assignments are to the effect that the petition was defective for the reason that therefrom it could not be ascertained whether the suit was brought under the federal Employers' Liability Act, or under the statutes of Texas. The suit was brought by R. E. Stalcup, as administrator of the estate of J. E. Brown. It is alleged substantially that the line of road runs from Ft. Worth, Tex., to Denver, Colo. It is expressly alleged that when deceased was killed he was engaged in making up a train at Texline, Tex., to be moved into and through New Mexico and Colorado; it is alleged also that the defendant ran through trains over its line of road from Ft. Worth, Tex., to Denver, Colo. The suit is brought by a personal representative, and not by the wife of the deceased. The evidence is that at the time the deceased was killed there was at least one car in the train from Oklahoma, on its voyage to Denver, Colo., loaded with broom corn, and other cars in fact were to be taken out of Texas into New Mexico and Colorado. The suit, having been brought by the administrator, itself is a sufficient designation of the act under which it was brought. Voelker v. Ry. Co. (C. C.) 116 Fed. 869; Ry. Co. v. Cox, 159 S. W. 1042; Ry. Co. v. Ellis, 153 S. W. 701.

[17] The nineteenth assignment asserts that the verdict should be set aside because it is excessive. The verdict is for the sum of $7,500. The deceased was 43 years old, and earning from $125 to $140 per month; was an experienced brakeman, and in line of promotion, sober, and industrious. We think the assignment should be overruled.

We find no such error as will require at our hands a reversal, and the judgment is affirmed.

### On Motion for Rehearing.

[18] Appellant, by written argument, in support of its motion for rehearing, assails the action of this court in overruling assignment No. 11, which is based on the admission of Mrs. Brown's testimony to the effect that she and deceased did not own any property at the time he was killed. In addition to the testimony objected to she testified the deceased provided "good and well" for her, and that she did not "want for anything at all." He received an average salary of $125 to $140 per month, and that there was no one else dependent on him other than herself, and that he contributed to her all of his salary needed by her. Some months they would use all of his salary. "That they were wholly dependent on his salary." The deceased helped her in her housework, and when at home, etc. We can see but little difference between

her testimony that they "did not own any property at the time he was killed" and the statement "that they were wholly dependent on his salary." The latter statement substantially includes the former. To the latter statement no objection was lodged. If the evidence objected to should have been excluded, its admission was harmless, as substantially the same evidence was before the jury without objection. In its argument, appellant cites quite a number of cases in which the courts have held that the poverty of the litigant was not admissible. In most of the cases cited such testimony clearly was not admissible under the issues therein, and could have had but the effect either to prejudice the jury against the opposite party, or to arouse sympathy for the party in whose interest it was given. Such is not the purpose of the evidence in this case.

The Court of Civil Appeals, in the case of Railway Co. v. Gormley, 35 S. W. 488, and this court, cited the case of Railway Co. v. Lehmberg, 75 Tex. 68, 12 S. W. 838, as authority sustaining the action of the court in admitting the testimony of which complaint is made. Appellant asserts the Lehmberg Case is in no way applicable, and does not support the action of the court in the admission of the testimony. We must differ with appellant. In that case the Supreme Court said:

"Every parent and husband has, for his wife and children, a pecuniary value beyond the amount of his earnings by his labor or vocation. That value may, to some but not to every extent, be susceptible of allegation and proof, and to the extent that it can be alleged and proved it ought to be done. The difficulties of proof are known to the lawmaker. * * * When no amount is fixed by law and no rule is prescribed for making the calculation upon facts capable of exact ascertainment, it necessarily follows, we think, that the lawmaker intended that, having reference as far as practicable to conditions existing at the time of death, juries from their own knowledge, experience, and sense of justice should fix and assess the proper sum."

That court, quoting from a New York case, used in part the following language:

"They [the jury] must be satisfied that pecuniary injury resulted. If so satisfied, they are at liberty to allow them from whatever source they actually proceeded which could produce them. If they are satisfied from the history of the family or the intrinsic probabilities of the case that they were sustained by the loss of bodily care * * * they are at liberty to allow it."

At the time of the death of the deceased, he and his wife had no property but relied alone upon his wages for support and sustenance. He and his wages were all the wife had to lean upon for support. These were the conditions at the time of his death. This support was lost. What was her pecuniary loss? He had life expectancy, according to the testimony, of 26 years, and was then getting $125 to $140 per month, and his efficiency in his vocation under railroad management indicated advancement. If this support was cut off, and there was nothing else to supply it, we see no reason why a jury should not have this condition and history existing at the time of his death as a means by which they might calculate pecuniary loss to Mrs. Brown in the death of her husband.

In the case of Railway Co. v. Johnson, 99 Tex. 337, 90 S. W. 164, our Supreme Court recognized the admissibility of testimony of the character here objected to in cases of this kind. While distinguishing the case then in hand from the class where the rule admitting the testimony is applicable, the court said:

"The decisions relied on to sustain this ruling were made in cases in which the plaintiffs sued for damages resulting from the death of relatives in which their rights of * * * damages consisted of the value of pecuniary benefits or contributions which they would have received from the deceased had they lived; and evidence of the necessity for such help arising from the poverty of the plaintiffs tended to show the probability that it would have been extended."

Under this proposition the court cites cases supporting it. There is no injury shown by the admission of the evidence complained of, even if it was inadmissible under the rules of law.

It is also strenuously urged that the argument made in the trial court by appellee's counsel should reverse this case. In our original opinion we held the argument improper. The amount of the verdict does not indicate to our minds prejudice or passion on the part of the jury. The verdict we cannot say is excessive in amount, and therefore do not feel warranted in presuming that the argument did arouse passion and prejudice in the mind of the jury, especially after the trial court had instructed them that the argument was improper. That attorneys will indulge in improper argument when they know they ought not is one of the psychological phenomena not yet explained, but they do, as the courts and the profession know. If courts gave heed to all the complaints made to arguments by attorneys, more cases would be reversed than are. The courts doubtless to some extent take cognizance of this peculiar weakness in our profession, and, when no injury is shown, admonish the attorney rather than punish the client, who would be the sufferer if the case be reversed because of the improper arguments, frequently made, on account of the temperamental inability to refrain from taking a fling rather than a deliberate purpose to violate the rules. No reason has been presented in the motion for rehearing inducing us to change our views on this case.

The motion for rehearing is overruled.