CHESAPEAKE & O. RY. CO. v. PROFFITT.

(Circuit Court of Appeals, Fourth Circuit.   September 8, 1914.)

No. 1247.

1. MASTER AND SERVANT (§ 226*)—INJURIES TO SERVANT—ASSUMED RISK—
RAILROADS.
Where plaintiff, while coupling the air hose between certain cars in the front of a freight train, which he had been ordered to assist in making up, was injured by the violent shoving or kicking of other cars against those left standing on the main track by a switching crew, in charge of an engine which was cutting out certain cars in the rear of the train in a negligent, noncustomary manner, plaintiff did not assume the risk.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 659–667;  Dec. Dig. § 226.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

2. APPEAL AND ERROR (§ 979*)—DAMAGES—EXCESSIVENESS—REVIEW.
The correction of an excessive verdict is a question for the trial court on a motion for a new trial, and will not be reviewed by the Circuit Court of Appeals on a writ of error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3871–3873, 3877;  Dec. Dig. § 979.*]

In Error to the District Court of the United States for the Eastern District of Virginia, at Richmond;  Edmund Waddill, Jr., Judge.

Action by Claude L. Proffitt against the Chesapeake & Ohio Railway Company.   Judgment for plaintiff, and defendant brings error.   Affirmed.

David H. Leake, of Richmond, Va. (Walter Leake, of Richmond, Va., on the brief), for plaintiff in error.

C. V. Meredith and Hill Carter, both of Richmond, Va. (Meredith & Cocke, of Richmond, Va., on the brief), for defendant in error.

Before PRITCHARD and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge.   This is an action at law, instituted in the United States District Court for the Eastern District of Virginia by the defendant in error, plaintiff below, against plaintiff in error, defendant below, under the provisions of the "Employers' Liability Act" (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]), for the recovery of $20,000 damages on account of personal injuries sustained while the plaintiff below was endeavoring to couple the different sections of a train belonging to the defendant below.   The jury returned a verdict in favor of the plaintiff for the sum of $11,000, for which judgment was entered, and to which the plaintiff in error excepted, and the case comes here on writ of error.

Hereinafter the defendant in error will be referred to as plaintiff, and the plaintiff in error will be referred to as defendant;  such being the respective positions these parties occupied in the court below.

It appears that in the nighttime of July 2, 1912, between 3 o'clock and half past 3, plaintiff, as a brakeman upon a train of the defendant, was required by the yardmaster of the defendant at the Gladstone yards

to assist in making up a train to be started eastward. The train was a manifest train, or fast freight, and had come from some of the Western states. It was shown that when such a train reached Gladstone it was the custom, when necessary, to remove certain cars and to attach others. It was claimed by the defendant that, in taking out or pulling in cars which have to be taken out or put in, it was customary for the crew of such train to do such work on the front, and for the crew of the yard or switch engine to do the work needed on the other end of the train. It appears that the yardmaster thought that work was necessary on both ends of that train, and ordered the respective crews to do such work.

The train consisted of an engine and 35 or 40 cars. The yardmaster ordered the plaintiff to set out the second, third, and fourth cars from the engine and put them on track No. 6, and then to couple up to the train and they would be ready to go. The plaintiff, as ordered, cut out those cars and left them on track No. 6, and then came back upon the main track with the engine and the first car, which remained attached to the road engine. Then the engine and this car were backed to the other cars of the train left standing on the main track. The car attached to the engine and the first car left standing on the track were automatically coupled to each other, but it was necessary to couple the air hose by hand. To do that the plaintiff had to step within the tracks and attach the two ends of the air hose together. It appears from the testimony of plaintiff that before attempting to do that work he looked down the track, but saw no light nor any signal; that he was not aware of the fact that under the orders of the yardmaster the train had again been divided—that is, that 7 or 8 of the cars had been left standing still, and the rest, or 29 in number, had been carried away from them by a switch or yard engine, so that some other car or cars might be cut out; that he had no notice or warning that there was any danger of the cars which had been carried off by the switch engine being shoved or "kicked" by the yard engine against the cars left stationary on the track, and to which he had been ordered to couple the car attached to the road engine; that having no knowledge of such danger, and having looked down the track and seen no light nor signal, he stepped between the cars and hitched together the two ends of the air hose. While so at work he was struck by the car to which he had been ordered to couple the car attached to the engine; that he was knocked down and run over by the car which struck him, and his right arm was cut off close to the shoulder.

C. C. Perkins, a locomotive fireman for the defendant company, testified as a witness for plaintiff that he was on duty the morning plaintiff was hurt, that he was on the regular engine of the train, and that there were 2 or 3 cars between him and the place where plaintiff went in to connect the air hose. In response to a question as to the force of the impact, he said:

"The engine was backing and carrying 45 pounds and the injector was working. I was drinking a little coffee and eating lunch on the opposite side, and the lick was so severe it knocked me backward in the coal bin."

He also testified that the engine was knocked forward a distance of 20 feet, and that it was as hard a lick as he had ever experienced on the

railroad; that the engine and tender had an independent brake, which was not on the cars; that this brake had a pressure of 45 pounds to the square inch; that it equalizes 70 pounds to the inch; that—

"the injector * * * was working at the time before the lick; that when the lick came it knocked the injector off and stopped it working; that he was leaning up against the cab of the engine in front of the coal bin, and was knocked across into the coal bin; that he stepped off the distance that the engine was knocked forward, after the lick; that he measured by the lantern and overalls on the rails and the distance the engine was standing, and that it was 20 feet; that he did not notice whether there were many cars behind him or not; that notwithstanding the brakes on the engine the engine was driven forward 20 feet."

C. J. Jackson, a witness for defendant, testified, among other things, that he had been a yard brakeman since 1890, and was acting as such at the time the plaintiff was injured; that when the cars were shoved in that he was standing on the head end—

"coming down to make the coupling; that he didn't make the coupling himself, but stayed there and saw it made; that the coupling was made automatically; that he didn't know how fast the cars were coming in there; that, when the cars got nearer together, they have a way of holding up the lamps to steady the engine by, and when they get still nearer they shut the engine off; and that was what they did that night."

W. C. Taylor, also a witness for defendant, who was yard conductor at the time of the accident, testified that he told plaintiff on the night the accident occurred to work on the rear, and also to do work at the head, and that he would work on the rear, so that they could get the work done. He also testified as follows:

"That 2 lumber cars had to be put out at the rear; that there were 29 or 30 cars pulled out by the people working under him; that they pulled out this cut of cars and threw out 1 or 2 local cars, and then shoved the remaining cars up, and coupled up the end car that was standing on another track; that there were 8 cars standing on the track; that Proffitt had taken out 3 from the front end and left 1 next to the engine, and that left 29; that the cars were shoved down very light, and the air working on them; that they were controlled by air; that the coupling as made was not a very hard lick, but about the same as usual; that he was with the yard engine doing work on the rear when they coupled up; that a man rode on the front end of the cut of cars that was coupled up; that his name was Charles Jackson, a colored brakeman, and that he had a lantern; that it was July; that it was not real dark, but that they had to work with a lantern to give the signals, and that signals could not be seen without a lamp; that the way it was done that night was customary then and now."

Upon being questioned as to whether he knew that the brakeman, Jackson, was on the front end of the car at the time the accident occurred, he said:

"I don't know it, but he got down and passed me ahead. We had to pull the cars back to do the shifting on the rear, and the front end started back; he got on the end car."

The testimony of this witness was contradicted by Carter, a witness for defendant, who testified that the first time he was apprised of the fact that anything had happened was after he went to get the caboose of the train. Further testifying as to the manner in which the train of cars was sent in, witness said:

"That the brakeman, Jackson, was on the engine; that McCoy had been following the engine all night, and he was the man supposed to follow the engine; that he didn't know where McCoy was at the time the switchman was acting in his place; that Charles Jackson was standing on the step, and that he or Conductor Taylor, one of them, gave the witness the signal for the slack for the pin, and he gave it and relieved his brake; that the cars started in at about 3 or 4 miles an hour; that Jackson pulled the pin, and Conductor Taylor was standing on the steps."

Counsel for defendant at this point stated to the court that witness had taken him by surprise, in that he had stated that Brakeman Jackson was on the engine. The witness then testified as follows:

"Q. Mr. Carter, you did not tell me that the other day, did you? A. I do not know that you asked me. Q. Mr. Carter, do you know who was on the front end of the train? A. On the front of the train, no, sir; I cut all the cars. Q. You do not know who was on the front? A. No, sir; I cannot tell. Q. He cut all the cars going down the track. You do not know whether McCoy was there, or not? A. No; I do not know whether he was. Q. You say it was Jackson on the engine? A. Mr. Leake, it was Jackson on the engine, and Conductor Taylor; where McCoy was I do not know. I want to give you all the information you want, and to do what is right."

J. A. Capell, a witness for defendant, among other things testified that:

"In shoving in a cut of cars, you come in so you can stop them with the engine; but kicking them in, if you started to do that, they come down. * * * In kicking cars, a man rides on the foremost car to control it with hand brakes."

There was other evidence offered by the plaintiff and defendant bearing upon the question as to whether the cars were moved in the customary manner on this occasion.

While such is the custom, it is insisted by counsel for plaintiff that the defendant failed to place a brakeman on the front end of the same, so as to control its speed and thus prevent what the evidence tends to show happened, to wit, the rear or detached portion of the train coming in contact with the stationary cars at such an unusual rate of speed as to cause the front cars and the engine to be pushed a distance of 20 feet, notwithstanding the fact that the engine brakes were applied with the maximum pressure.

While the colored brakeman, Jackson, testified that he rode on the front end of the cars that were being sent in, nevertheless he is contradicted by the witness Carter, also a witness for defendant, who says that the cars were not shoved in by the engine. He also testified that Jackson was on the steps of the pilot at the time the cars were kicked in, and therefore could not have been riding on the front end of the same at that time, as contended by defendant. This witness also contradicts the witness Taylor as to the manner in which the cars were sent in; Taylor having testified that the cars were pushed in by the engine. Thus it will be seen that there is a sharp conflict of evidence as to whether the cars were sent back in the customary way and at the usual rate of speed.

[1] It is earnestly insisted by counsel for defendant that the principal question is as to whether the rule in regard to what is known as "assumed risk" is applicable to the facts of this case. In other words, it is insisted that the plaintiff assumed the risk incident to his

employment, and that, therefore, he would not under the circumstances, be entitled to recover. It is well settled that, where one is employed as in this instance, he assumes the ordinary risk incident to the work in which he is engaged; but he does not assume such risk as may be due to the negligence of the defendant, its officers, agents or employés. The record filed in the Supreme Court in the case of Pedersen v. Del., L., etc., R. Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, contained the charge of the court below, in which, among other things, that court, in referring to the question of assumed risks, said:

"Then there is another matter which has been called to my attention upon the part of the defendant company, namely a subject which is often properly called the assumption of risk upon the part of a servant. Without attempting to explain that at all in detail, I may perhaps give you one illustration, which will suffice to show what is meant by it. A servant undoubtedly takes the risk of his employment up to a certain point; and the more dangerous the employment, of course, the more risk he takes. The illustration I have in mind, which I think may be sufficient to explain it, is one of these structural iron workers. We know what a dangerous work that is. There are certain risks to that business which are obvious. It is an occupation that requires the greatest precautions. There is a risk of his foot slipping, there is risk that he may not catch hold properly, or with sufficient accuracy to maintain himself in a dangerous place, and there are many other dangers; but that will suffice. Now, he takes those risks; they are incident to his business, and he cannot carry on his business without them. He must take those risks or he cannot do the work, and therefore, when a man accepts employment as a worker upon that sort of a building, he necessarily takes the risk upon himself that he may be injured by some such action as that; but he does not take the risk of the negligence of his employer. Neither, in the case which we now have in hand, did the plaintiff, in accepting the employment in which he was engaged, take the risk that his employer, the railroad company, would be negligent in the duty which it owed to him. Therefore, as the only claim in this case with regard to injury is that it arose from the negligence of the employer, you can lay aside the subject of the assumption of risk on the part of the plaintiff. In my judgment, it has nothing to do with the present case."

While counsel for plaintiff concede that one assumes the ordinary risk incident to his employment, nevertheless they contend that in view of the evidence in the case at bar the question of "assumed risk" is not involved. It is also conceded that the detaching and attaching of cars in the manner adopted by the defendant, to wit, in working on both ends of the train in making it up, was customary at the point where this accident occurred; but it is contended that, had the care and caution ordinarily exercised by the company been used on the occasion in question, the accident would not have occurred, and that, therefore, the injuries sustained were due to the negligent and careless manner in which the cars were pushed or kicked against those that were being coupled by the plaintiff.

It is contended by counsel for defendant that the doctrine of "assumed risk" as applicable to common carriers has not been changed by the Employers' Liability Act, except in the one case—

"where the violation by such common carrier of any statute enacted for the safety of employés contributed to the injury or death of an employé."

This question, according to our view, is not at issue in this controversy. It is not alleged in the declaration that the method employed by the defendant company of working a crew at each end of the train

was an act of negligence, nor is it alleged that the custom as respects the shoving together of cars at a reasonable rate of speed amounts to negligence on the part of the defendant. On the other hand, it is alleged that the cars were being—

"carelessly, negligently, and without giving him any notice, or warning, and without taking any precautions, backed by its engines * * * with great force and violence and at a great and improper speed."

This is the question that was submitted to the jury with proper instructions as to the law bearing upon the same, and after due consideration the jury returned a verdict in favor of the plaintiff. This verdict implies that the customary manner of shoving or kicking the cars together was not observed on this occasion, and the establishment of this fact clearly distinguishes the case at bar from the cases relied upon by the defendant, wherein it is held that where one is employed he assumes the usual and ordinary risk incident to such employment. Such being the case, we do not deem it necessary to enter into a discussion of the effect of section 4 of the Employers' Liability Act.

[2] It is further insisted that the court erred in denying a motion to set aside the verdict, based upon the ground that it was excessive. In the case of North Pacific R. R. Co. v. Charless, 51 Fed. 562, 2 C. C. A. 380, syllabus 7 is in the following language:

"The correction of an excessive verdict is a question for the trial court on a motion for a new trial, the granting or refusing of which will not be reviewed by the federal appellate courts."

The cases of Erie R. R. Co. v. Winter, 143 U. S. 61, 12 Sup. Ct. 356, 36 L. Ed. 71, and of Fitch v. Huff, 218 Fed. 17, 134 C. C. A. 31, decided at this term of the court, and the cases cited therein, are to the same effect.

However, it is insisted that the court below erred in not giving certain instructions that were tendered by the defendant. A careful consideration of the assignments of error which relate to the judge's charge, in view of the facts of this particular case, impels us to the conclusion that the case was fairly and impartially submitted to the jury, thus affording them an opportunity to pass upon the real question upon which this case turns, and they, after weighing the evidence, as we have stated, reached the conclusion that the cars were negligently and carelessly pushed or kicked in at an unusual and higher rate of speed than is customary in such cases.

For the reasons stated, we are of opinion that the judgment of the lower court should be affirmed.

Affirmed.