No. 20,777.

ELSIE WESTLING, as Administratrix, etc., *Appellee*, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Sudden Jerk of Train—Death of Employee—Evidence.* The evidence reviewed, and held to support the plaintiff's claim that the death of her husband was caused by the negligence of the defendant in the manner alleged.

2. TRIAL—*No Error.* Instructions examined and no error found therein.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed June 9, 1917. Affirmed.

*William R. Smith, Owen J. Wood, Alfred A. Scott*, and *Harlow Hurley*, all of Topeka, for the appellant.

*Alfred M. Jackson, Albert L. Noble,* and *Carroll L. Swarts,* all of Winfield, for the appellee.

The opinion of the court was delivered by

WEST, J.: Plaintiff recovered a judgment for $12,000 for the death of her husband under the federal employers' liability act, he having been killed by a fall from the tender of an engine on which he was fireman, the allegation being that the fall was caused by violently and suddenly, and without notice, jerking the tender, throwing the deceased therefrom. The defendant appeals. The complaints presented in the brief are that there was no evidence of mismanagement of the engine, and that instruction number eight was bad. The answer presented a general denial and plea of assumption of risk.

On behalf of the defendant a railway mail clerk, a conductor, a brakeman, a rear brakeman, an engineer and two passengers all testified in substance that there was no violent jerking or rough handling of the train. The engineer testified that he saw the deceased standing on the coal tender about two or three feet from the side of the tank, that when he missed him he started back and found him lying about 200 feet from the west end of the curve over which the train had passed. On redirect examination he testified:

"When I am drifting down the way I was I have perfect control of the train with the air. I had no trouble stopping. After I saw the fireman was gone I didn't stop immediately. I looked for him around the train before I stopped. It would take about ten seconds to stop the train if I wanted to. The reason I didn't stop instantly was because I thought he might be on the train. At the time I looked back and saw him standing on the car in the tender, I hadn't reached the point of the curve. The curve is just about at the public crossing. Just as I released the air I looked back. He was standing there when I had released the air. I just glanced up and saw him. At that time there was no jar or jerk."

A witness for the plaintiff, who was riding on the train with his wife, testified:

"A sudden lurch of the train attracted my attention at the time. The train stopped after running one-half to three-quarters of a mile after the lurch. The conductor and brakeman got off the train, walked forward and then ran back. The train was backed up to where the fireman was found. The fireman was dead when found. The fireman was found at about the same place the lurch occurred. We were lurched or jerked

Westling v. Railway Co.

back in our seats. It was a sudden starting and stopping. This lurch would have thrown a person standing in the aisle of the coach from their feet. The passengers in the coach remarked that the lurch was very sudden."

A former section foreman of the company, who was on the train, testified:

"After I left Chautauqua Springs that day there came a sudden jerk, forward and back. I supposed it was the air brake. It was a sudden quick jerk, forward first, and then jerked backward. It was something very uncommon for a train to do running like that; it was running fifteen or twenty miles an hour. This jerk was of a nature sufficient to call my attention to it. I have been jerked around that way on side tracks but I never was jerked that way while riding in a coach. When the jerk first happened I thought it was a car off. The jerk was something unusual in my experience. A man standing in the aisle would have had to grab at something to have stood on his feet. . . . This sudden jerk was the same place where the man was found. The jerk that I have mentioned produced excitement among the passengers."

This witness' wife testified concerning the jerk:

"It was something very unusual that I had never had while riding on a train. The jerk went on for a while. It finally stopped. This jerk was the only jerk I experienced while on the train. I heard something said by some one while I was on the train with reference to the jerk. This jerk, it was sudden; I feared it was a wreck. . . . This jerk was so sudden that I felt it was a wreck, and that was the first thought that came to me, and I went to praying."

A daughter of the witness just mentioned testified:

"After the train left Chautauqua there was a very severe jerk. Anyone standing would have had to hold on to something to stand on his feet. I was sitting with my mother in the rear coach. It was before the train stopped. After this severe jerk the train ran a ways and stopped."

Special questions submitted by the plaintiff were answered to the effect that the fireman was thrown off the tender by reason of the sudden and violent jerk of the train caused by the operation or management of the engine. Questions submitted by the defendant were answered to the effect that the deceased had had five years' experience as a trainman, had been over the run twenty-six times a week; that the danger of standing upon the coal in the tender was as apparent to him as to defendant or its other employees in charge of the train,

and that he was capable of knowing and measuring the danger thereof. Also, that the negligence of the defendant caused or contributed to the death, that it consisted of a sudden jerk of the engine, and that the deceased was not guilty of contributory negligence. In view of the evidence referred to and the findings, the first contention of the defendant, that there was no evidence of mismanagement or of any unusual jerk or lurch to the tender and no evidence to support the findings, can not be sustained. Certainly the testimony on the part of the plaintiff was sufficient basis for finding and concluding that the death was caused by being thrown from the tender on account of the sudden jerk of the engine.

It is argued that the eighth instruction was vicious because inferentially authorizing the jury to find for the plaintiff if he fell by reason of a lurch or jerk, regardless of whether such lurch or jerk was ordinary or extraordinary or whether or not caused by the negligence of the engineer in the management of the engine. It is said that it presented the doctrine of *res ipsa loquitur* and gave the jury license to find that evidence of a jerk necessarily meant a jerk caused by the negligence of the engineer. The instruction complained of stated that the plaintiff relied upon a chain of facts and circumstances which she claimed were sufficient to charge the defendant with wrongfully causing the death of her husband, and as constituting negligence on the part of the defendant, and continued:

"A given fact may be proven by circumstances, as well as by direct testimony, and in this case, if you believe the facts and circumstances proven are consistent with each other and inconsistent with any other reasonable hypothesis than that the deceased fell from said train by reason of a lurch or jerk, if you find that any such lurch or jerk was made, and was thereby killed, then you would be justified in finding that the deceased fell from such train by reason of such lurch or jerk."

It is stated in the plaintiff's brief that in the other instructions the court explained to the jury that before the plaintiff could recover she must prove negligence on the part of the defendant and show that it and its employees did not exercise ordinary care in the management of the train, and that by reason of the want of ordinary care the fireman was thrown from the tender and killed. Assuming this to be correct, the charge thus given when connected with the quoted portion of

instruction number eight seems fairly and correctly to have stated the law of the case, that in order for the plaintiff to recover the jury must believe, from the evidence and all the circumstances shown, that the lurch was caused by the negligence of the defendant in the operation of its train, and that the fall from the tender was caused by the lurch. (See *Philadelphia & R. Ry. Co. v. Marland*, 239 Fed. 1.)

The judgment is affrmed.