BEAUCHAMP v. MICHIGAN CENTRAL RAILROAD CO.

1. APPEAL AND ERROR—ON DEFENDANT'S MOTION FOR DIRECTED VERDICT FACTS MUST BE CONSIDERED MOST FAVORABLY FOR PLAINTIFF.

In reviewing the action of the trial judge in denying defendant's motion for a directed verdict, the facts must be considered in the light most favorable to plaintiff's right to recover.[1]

2. MASTER AND SERVANT—RAILROADS—ENGINEER'S FAILURE TO SLOW DOWN NOT NEGLIGENCE WHERE NO SIGNAL GIVEN.

In an action against a railroad company for the alleged negligent death of plaintiff's decedent, a brakeman, who was killed by being thrown from the top of a freight car by its impact with a car coupled to the locomotive during switching operations, where it appears that deceased, who was temporarily in charge of the switching, gave the signal to back up, but did not give a signal to slow down as the cars were about to meet, the engineer, who could not see the car he was approaching because of a curve, and

---

[1] Appeal and Error, 4 C. J. § 2709.

was not aware of deceased's danger, was not guilty of negligence in failing to slow down before the impact.[2] McDONALD, C. J., and BIRD and MOORE, JJ., dissenting.

Error to Bay; Houghton (Samuel G.), J.    Submitted January 20, 1925.    (Docket No. 93.)    Decided July 16, 1925.    Rehearing denied October 1, 1925.

Case by Emily Beauchamp, administratrix of the estate of Ralph Beauchamp, deceased, against the Michigan Central Railroad Company for the alleged negligent killing of plaintiff's decedent.    Judgment for plaintiff.    Defendant brings error.    Reversed, and judgment ordered entered for defendant.

*Walter S. Wixson,* for appellant.

*Dahl & McDonald* and *Lodge & Brown,* for appellee.

SHARPE, J.    Ralph Beauchamp was in the employ of defendant in its yards at West Bay City as a member of its switching crew on February 21, 1923.    He was thrown from the top of a box car by its impact with a car coupled to the locomotive, and sustained injuries from which he died a few hours later.    Plaintiff, as administratrix of his estate, brings this action to recover damages therefor.    She had verdict for $15,000.    At the close of the proofs, defendant's counsel moved for a directed verdict, which was taken under advisement by the court.    It was renewed after verdict and denied, and judgment entered on the verdict.    It is here insisted that this motion should have been granted.

We must consider the facts in the light most favorable to plaintiff's right to recover.    There is, however, no substantial dispute as to how the accident happened.    The switching crew consisted of an engineer, fireman, conductor and two brakemen.    Their

---

[2]Master and Servant, 26 Cyc. p. 1152.

operations took them to what is known as the Clute Coal Company's yard. While there, the fireman left the cab in response to a call of nature, and one of the brakemen took his place. Some cars had been pushed upon one of the sidings. The conductor rode on one of them to stop them where they were intended to be placed. He had not returned at the time of the accident. It was discovered that two box cars which had been placed on a siding had not been pushed in far enough to clear. The box car coupled to the locomotive stood about 40 feet from the switch. The deceased opened the switch and signaled the acting fireman, on whose side he was, to back up. He then passed between the cars. The fireman informed the engineer that deceased had passed over to his side. The engineer, in response to the signal, backed his locomotive. Unknown to both the engineer and fireman, the deceased went up the ladder of the standing car nearest to the switch and released the brake on it. While yet on the car, the car attached to the locomotive came in contact with the standing car, the impact causing the deceased to fall between them.

The negligence of the defendant is predicated on the conduct of the engineer. The court charged the jury:

"If  *  *  * this locomotive and car was operated in an unusual manner, and was driven back with an unusual force, and not in the manner in which a careful, prudent engineer, a capable engineer, would have done, then it is for you to say whether or not they were not guilty of negligence, and if they were guilty of negligence it is for you to determine whether or not that negligence was the proximate cause of the injury; if it was not then there could be no recovery, and if there was there would be."

The conductor, called for cross-examination by the plaintiff, in answer to questions put by her counsel, testified:

"My duties in connection with actual operation in addition to keeping these records was to see that the work was done, direct it I mean.    It was just as much my duty, as the other two men on the job, to signal the engineer ahead or swing him back or signal him to stop, in the ordinary way of doing business.    We would couple onto cars when other cars were attached to the engine at different times; there is always a man to guide the engineer by giving him signals.    According to the way you want the engineer to go, if you want him to go ahead he would signal that way (shows), and to back up (showing) that way.

"*Q.* Supposing the engineer was signaled to back up his engine for the purpose of coupling onto another car, was there any one to give him a signal as to when he was getting near that car so that he could slow up?

"*A.* Yes, sir.

"*Q.* How was that signal given?

"*A.* Well, sometimes we take both hands like that (showing) or sometimes just take one hand (indicating).

"*Q.* Indicating by signals of the hands the nearness of the car to be coupled to the other car to which it was to be coupled?

"*A.* Yes, sir.

"*Q.* So that he could regulate his speed and not hit it too hard?

"*A.* Yes, sir.

"*Q.* And one of the switchmen would give those signals to the engineer?

"*A.* Yes, sir.    *    *    *

"*Q.* It is customary and proper practice is it when an engine with cars attached, or without cars attached, backs up to couple onto another car or shunt it, for a switchman to be on the ground and signal the engineer?

"*A.* Yes, sir.    That is customary and proper practice.    The purpose being to guide the engineer and indicate to him the nearness of his approach to the car that he is coupling onto."

The practice as thus explained seems to be conceded. In the absence of the conductor, the movement was in charge of the deceased.    He was master of the situa-

tion.    It was the duty of the engineer and fireman
in handling the locomotive to be governed by his
signals.    They were unable to see the car to which
the coupling was to be made.    It was the duty of
the engineer to keep on backing up until he received
a signal to slow down, indicating his nearness to it.
It was the duty of the deceased to give such signal.
None was given.    We are unable to see how the act
of the engineer, in backing up without slowing down
when the cars were to meet, can be said to be neg-
ligent.    He had a right to expect that he would re-
ceive the signal to do so in time to act.    There is
no claim made that the engineer knew, or had any
right to expect, that the deceased would leave the
ground, after giving the signal to back up, and go up
the ladder of the standing car to release the brake.
If he deemed it necessary to do this, he should have
done so before giving the back up signal.    This signal
started the locomotive and car attached to it in motion,
and under the practice that motion would not neces-
sarily lessen until a signal was given to reduce the
speed.    The engineer testified:

"I had an idea he might have went in to adjust the
couplings or something of that kind."

He had no "idea that he would be on top of the car,"
or "that the brake had been set on that car;" he ex-
pected he would "come over on my side and give
signals."

There is proof that, as the cars came together, they
"struck hard," that there was a "loud crash," "a louder
crash than usual."    This was but the natural result
of the movement as made.    The engineer had a right
to expect a signal to slow down when nearing the car
to be coupled to.    No such signal having been given,
it would necessarily follow that the cars would come
together with greater force than was usual.    The
distance being not to exceed 50 feet, a high degree of

speed could not have been attained. The weight of the locomotive and car attached to it and the car struck was such that, unless the speed was reduced to the minimum, there would be much force in the impact. Such force as compared with that usually resulting from the coupling of cars is not in itself evidence of negligence on the part of the engineer. His conduct in handling his locomotive must be viewed in the light of the signal he momentarily expected to receive informing him that the car attached to his locomotive was nearing the one standing on the switch and that he should slacken speed before reaching it. The engineer had been in the employ of the defendant in that capacity for 34 years. There is no evidence that he was not competent and careful in the discharge of his duty. We are impressed that under this record he should not be deemed guilty of an act of negligence causing the death of his fellow workman.

But few cases have been called to our attention in which a similar question was presented. In *Hunt v. Railroad Co.,* 181 Iowa, 845 (165 N. W. 105, L. R. A. 1918B, 369), a conductor of a freight train was thrown violently to the floor of the caboose while standing therein and rendered unconscious for several hours as a result of the sudden application of the brakes in order to stop at a water tank. He testified that it was "the most violent shock" he had experienced in seven years of service. The action was brought under the Federal employers' liability act. The court said:

"That such a stop would result in a jerking more or less severe is a matter of such common knowledge as to have come practically within the range of judicial notice. The books are full of cases where negligence has been predicated upon the jerking of a freight train, and it has been held with practical unanimity that the jerking of a freight train, even though severe and unusual, is not of itself evidence of negligence as to employees operating the same. It becomes negli-

gence only when the injured employee is known to be in a position of peril."

Many cases are cited in support of the holding.

In *Southern Railway Co.* v. *Carter*, 164 Ala. 103, 108 (51 South. 147), the court said:

"Sudden start and resultant injury proven, the burden was still upon the plaintiff to show that the engineer owed a duty to the plaintiff in the situation in which they were—in other words, to show that the engineer knew, or in the exercise of reasonable care ought to have known, that the plaintiff was in a position of peril when the engine was moved. That he did not know the plaintiff's peril is not debatable under the evidence."

In *McDermott* v. *Railroad Co.*, 56 Kan. 319 (43 Pac. 248), the facts and holding are sufficiently stated in the first paragraph of the syllabus as follows:

"In an action against a railroad company to recover damages on account of the death of a brakeman killed while making a flying switch, where the only negligence charged is that the engineer ran at an unnecessary, unusual and dangerous rate of speed, and the jury find specially that the engineer at the time of the accident was under the control of the deceased as to slacking up and going ahead, and that he obeyed the signals given him by the brakeman, *held,* that such special findings conflict with and overturn a general verdict in favor of the plaintiff."

The declaration also charged that—

"defendant negligently and carelessly failed and omitted to furnish a sufficient and adequate crew for the operation of said business of said train."

The undisputed proof showed that it was the practice when switching for one of the brakemen to relieve the fireman when he was temporarily absent. The deceased knew that the brakeman was so employed. He also knew that he alone was on the ground at the time he gave the signal to back up. The engineer

was under his orders and not in any way chargeable with lack of prudence in obeying the order in the absence of the conductor. The usual switching crew was provided by the defendant. In our opinion no negligence as to it can be predicated upon the act of the deceased in ordering the movement of the locomotive when he alone was present.

We feel constrained to hold that defendant's motion to direct should have been granted. The cause will be remanded, with direction to the trial court to enter a judgment for the defendant. Defendant will have costs.

CLARK, STEERE, FELLOWS, and WIEST, JJ., concurred with SHARPE, J.

BIRD, J. (*dissenting*). I am not in accord with the conclusion reached in this case by Mr. Justice SHARPE. In reaching the conclusion which he has he has, in my judgment, decided questions of fact as questions of law.

The case of *Louisville, etc., R. Co.* v. *Strange*, 156 Ky. 439 (161 S. W. 239), lays down the proper rule to be applied in such cases:

"It is the rule that brakemen on a train assume the risks and hazards arising from such jerks as are usual and ordinarily incident to the prudent operation of the train, and if injured or killed as a result of such a jerk there can be no recovery; *but if killed or injured as the result of a jerk which was unusual and unnecessary and so violent as to show a want of ordinary care on the part of those operating the train, then a recovery may be had.*"

Other cases supporting this rule are: *Erie R. Co.* v. *Linnekogel*, 248 Fed. 389, 160 C. C. A. 399; *LaMere* v. *Transfer Co.*, 125 Minn. 159 (145 N. W. 1068, Ann. Cas. 1915C, 667); *Devine* v. *Railway Co.*, 185 Ill. App. 488, 266 Ill. 248 (107 N. E. 595, Ann. Cas. 1916B, 481); *Louisville, etc., R. Co.* v. *Wright,*

202 Ala. 255 (80 South. 93); *Jones* v. *Railroad Co.*, 176 N. C. 260 (97 S. E. 48); *Dumphy* v. *Railway Co.*, 82 W. Va. 123 (95 S. E. 863, 10 A. L. R. 1152); *Westling* v. *Railway Co.*, 101 Kan. 87 (165 Pac. 669); *Ft. Worth, etc., R. Co.* v. *Stalcup* (Tex. Civ. App.), 167 S. W. 279; *Galveston, etc., R. Co.* v. *Paschall*, 41 Tex. Civ. App. 357 (92 S. W. 446); *Chesapeake, etc., R. Co.* v. *Proffitt*, 218 Fed. 23, 134 C. C. A. 37; *Graber* v. *Railway Co.*, 159 Wis. 414 (150 N. W. 489); *Cleveland, etc., R. Co.* v. *Gossett*, 172 Ind. 525 (87 N. E. 723); *Waters* v. *Guile*, 234 Fed. 532, 148 C. C. A. 298; *Seaboard Air Line R. Co.* v. *Horton*, 233 U. S. 492 (34 Sup. Ct. 635, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475).

Let us keep this rule in mind while we examine some of the testimony. The witness James Haslip, who happened to be near the accident, testified:

"I saw this man on top of the car. He was at one end of the car, the north end. I remember seeing one car, but I don't remember any more. He was on the end farthest from me. The next operation I saw I saw a man on top of the car as the engine came back, and I saw him when it struck the car. I saw him tumble down between the cars. They were struck hard.

"*Q.* Can you explain a little more in detail to the jury the force with which they were struck. * * *

"*Q.* What was the speed of the car?

"*A.* Well, I would not say what the speed was, but it was going fast. * * *

"*Q.* It was going fast?

"*A.* Yes, sir, it was. * * *

"*Q.* With what force did it collide with the car on which this man was standing? * * *

"*A.* Well, from what I could see from where I stood in the car, the car came with such force that it broke him absolutely loose from the car. * * *

"*Q.* What did you hear at the time of the impact?

"*A.* Well, I heard a terrible crash. * * *

"*Q.* Describe the noise as well as you can that you heard at that time.

"*A.* Well, as near as I could describe it is that it came together with such a crash that it made an extraordinary loud sound.    The man's hold broke and he fell between the cars.    My engine was still running. I did not stop the engine and I was leaning out of the window this way watching the movements of the train."

Frank Greenfield, who was employed by the Clute Coal Company, and was working in the yard, testified:

"*Q.* How was your attention attracted, if at all, to this accident?

"*A.* By the loud crash of the car.

"*Q.* Could you tell the jury, or describe to the jury, more definitely what kind of a crash there was?

"*A.* Why, it was pretty hard.    *    *    *

"*Q.* You may answer and describe what you heard.

"*A.* I heard this loud crash of the car, and I spoke up and said    *  ·  *    *

"*Q.* To what extent have you observed switching operations and the coupling together of cars, and heard the incidental noises?

"*A.* Why, I have worked around the railroads quite a good deal, heard the way they—saw the way they—

"*Q.* You worked for the Michigan Central?

"*A.* Yes, sir.

"*Q.* Where?

"*A.* Grayling.

"*Q.* How long?

"*A.* Pretty near two years for the Michigan Central.

"*Q.* In the yards?

"*A.* Yes, sir.    *    *    *

"*Q.* Now, I will ask you to describe, if you can, these noises compared with the noises you have theretofore heard in the coupling of cars.    *    *    *

"*A.* It was pretty hard, pretty hard crash.

"*Q.* Compared with others?

"*A.* Yes, sir, considerably harder than generally is on coupling cars together."

Lynn Robinson, a school boy 12 years old, testified:

"I was just coming around the corner by Pete Hayes' when Mr. Beauchamp was going up the side of the car.    That is on the corner of Marquette and Midland

street.    Marquette ends right there.    As I was coming around the corner I saw Mr. Beauchamp go up the side of the car and I got over by the oil station there and the train started up and gave such a bump that Mr. Beauchamp fell off.    Mr. Beauchamp was holding the brake wheel.

"*Q.* Did you hear any noise when the cars bumped together?

"*A.* I heard a big crash.    *    *    *

"*Q.* Have you at different times heard when cars coupled together in switching operations?

"*A.* Yes, sir.    *    *    *

"*Q.* You saw this crash and the noise it made, how did it compare with noises you have heard theretofore when cars were coupled together?

"*A.* Why, it was louder."

William Martin, who was within 25 feet of the track, testified:

"I was standing at the Midland street crossing with two friends of mine, and Mr. Beauchamp cut across the tracks going southwest, and climbed up on the car, and had about released that brake and was about to come down and this car came in with a crash, which I heard a lot of cars hard come together, and this is the loudest I ever heard, and he was flung between the cars, between them onto the track, and the cars ran over his legs and they were mangled.    *    *    *

"*Q.* How was it moving with reference to speed?

"*A.* Well, it was going fast."

Earl Bement, a school boy, 19 years of age, who happened to be in the vicinity, and observed what took place, testified:

"He was standing on a platform there, and he had hold of the brake wheel, whether he was moving it or not I don't know, and I also saw coming from the south a box car and engine, one box car and engine, and some instinct told me there was going to be an accident, whether the rate the box car was coming into the one Mr. Beauchamp stood on or not, I can't tell, but I felt there was going to be an accident, and before I could holler or anything the cars had collided with quite a jolt and it knocked him entirely loose

from the car and he fell and hit on the car that struck the original car he was standing on and knocked him against it, and then he fell and hit the other one, and he finally hit the ground, and he grasped to catch hold all the way down.   *   *   *

"*Q.* What can you tell the jury as to the speed of that engine and car?

"*A.* Well, I cannot tell it in miles per hour how fast that car was moving, but something alarmed me.   I don't remember it making any extraordinary noise because of my high excitement, and I was running at the time it struck."

The defendant's testimony was in conflict with some of this evidence.   This testimony clearly made it a question of fact for the jury whether it was the usual and ordinary operation, or whether it was the unusual and extraordinary operation.   The rule quoted was given to the jury by the trial court to aid them in coming to a conclusion, and the proofs clearly justified the jury in reaching the conclusion which they did. The opinion of my Brother clearly eliminates this question of fact.

The switching operations at the moment were being done within very narrow limits.   The engine had but one car to contend with, and, therefore, did not have to contend with any considerable amount of slack in its train.   The engineer knew he was not far away from the car, even though he could not see it.   If he could not see it, he should have either stopped or proceeded with caution.   Is it a question of law or fact whether he was operating his engine in the usual and ordinary way, or in the unusual and extraordinary way?   If the operation was on a curve and he could not see the car he should have either stopped or operated his engine more prudently.   But it is said the signal was given to back up and no signal given to stop, and the engineer had a right to keep going until he was signaled.   The engineer probably had the right to keep going in the ordinary and usual way.

He did not have the right to keep going in an unusual and extraordinary way. It was not the fact that he kept going which caused the accident, but it was the going in an unusual and extraordinary way that caused it. If he had been backing in the ordinary and usual way he probably would not have broken the hold of the deceased from the brake wheel.

How are you going to determine how fast the engineer was moving? Whether he was going slow or fast is not a legal question. It is a question of fact when the evidence is in conflict. How are you going to determine whether the engineer was operating his engine in the usual and ordinary way, or in the unusual and extraordinary way? Is that a question of law, or is it a question of fact?

It is said the engineer did not know that the deceased had left the ground and gone on top of the car. Why should that make any difference? The engineer had no right to operate his engine in an unusual and extraordinary way, whether the deceased was on the ground or on top of the car. If this testimony does not raise a question of fact as to whether the engineer operated his engine in the ordinary and usual way, then it would be extremely difficult to raise that question in a court of justice.

I think the judgment should be affirmed, with costs.

McDONALD, C. J., and MOORE, J., concurred with BIRD, J.